The next case on our calendar is Norman L. James v. and others v. Paul J. Van Blakum and others. Thank you. Morning. Good morning. I may please the Court, Nathaniel Charney, Charney & Wheeler, P.C., with my colleague Stephen Bergstein of Bergstein & Ulrich on behalf of the appellants who are five of the vast majority of black officers employed at the Ulster County Jail in Ulster County. We appeal before you, Your Honors, Judge Sotheby of the Northern District's granting of summary judgment in our claim for a hostile work environment based on race that is continuing to this day and has been going on for decades over at the Ulster County Jail in Ulster County. I want to speak about, and I believe this was really extensively briefed, the facts were set out in detail. I am going to try to not repeat what's in the briefing, and I just want to offer some highlights and some argument. And I want to draw your attention to Officer Pam Lancaster's experience. She's one of the plaintiffs. She joined the Ulster County Corrections Officer Group in the Ulster County Jail in 2007. Within a year, she was granted the nickname Buckwheat. Now, by the way, she's one of the, our plaintiffs other than one other person, they're the only black officers at the jail. She was nicknamed Buckwheat in 2018. She was subject to Nazi salutes routinely while she worked there. In 2014, she was told a joke by one of her colleagues about what it means when a black man is jogging. It means that they stole something, while when it's a white person, it means that they're just going for a jog. She was called, there was a reference to a mandingo hunter, which is a blatantly racist term. This is all over a series of years. And in 2015, she was told to go retrieve or get, or an inmate was referred to as that colored girl. Now, the person who called the inmate that colored girl to Officer Lancaster was Sergeant Palacco. In 1999, Sergeant Palacco used the term, the N word in the office, effing N, plural, within the jail. Almost immediately thereafter, he was promoted to sergeant. This is Palacco. So he uses this blatantly offensive term. Under any rendition, it's unacceptable. I'm not kidding, as the record makes clear. He was promoted almost immediately thereafter and became their boss. So it wasn't a handicap on his upward mobility. It was, I would dare say, Your Honor, that it was more than not a handicap. It actually accelerated his promotion within the department. Now, Officer Lancaster, also in the record, and I'm only doing this by example because all of the plaintiffs have the same stories to tell, but Officer Lancaster was routinely assigned to the pods, which is the worst assignment. That's working within the cell facility. She was never assigned to intake, even though she kept requesting it. White officers were routinely kept out of the pods and routinely given the intake assignments. She was denied promotions while white officers were given promotions. Can I interrupt you for a moment? Of course. To address the statute of limitations issue, you need to prove a continuing violation, is that right? Yes, sir. And to do that, there has to be a continuous policy or practice, which I think what you're getting to is something like that. But I'd like you to articulate for us, if you could, what the policy or practice that you're getting at is. I understand that you've, you know, described a bunch of unsavory conduct, but what is the policy or practice? The policy is the subordination of black officers through routine and practice of calling them names, of keeping them out of rich assignments, of keeping them from the opportunities to themselves express promotional efforts to move on. But if I may judge respectfully, I think the standard is a little bit different on continuing violation than showing a practice or policy. The standard is, do we have an event that is a component of the hostile work environment that occurred within the statute of limitations period? And under Judge Justice Thomas's decision, I don't remember the case, but it was a long time ago, it was the leading case that said as long as you have one of those events in the time period, you can look all the way back. We can look all the way back to 1999 when then-Officer Palacco, soon-to-be-Sergeant Palacco, was using the N-word, fucking Ns, excuse me, effing Ns within the jailhouse. So I believe that's the standard. And we have way more than we need within the statute of limitations period to get that hook. When does the statute of limitations period, how far back can you go? Well, we go back on the Title VII claim, we go back to 2013, August of 2013. On the constitutional claim, we go back to August of 2012. So if you look at August of 2013 and look at the first three, four pages of our reply brief, we list them. There are ten things that happened in the time frame. I want, before I run out of time, I'm sorry, Judge, is that sufficient? I'm just trying to understand. So to connect those incidents through the continuing violation, there has to be some common thread to them, right? And I'm still trying to understand if you could articulate for me what that is. The common thread is that management at the jail promoted and condoned a race-based hostile work environment. They allowed some of these incidents that you referred to. I believe there were reprimands. There were specific confrontations where action was taken, right? So it wasn't a universal, uniform practice of condoning such activity, I think. Well, let's talk about Sergeant Palacos saying effing ends within the jail. I believe he got written up or something, but then he was promoted to sergeant. So this is what, to the extent there was any disciplinary action or any adverse action taken against the white officers as they rose to prominence within the jail, it was, didn't inhibit their success at all. And it subjugated the black officers, all of whom, with the single exception, the only black officer who's not a plaintiff in this case is the only black officer that was recently promoted after we brought the lawsuit. The sergeants or what? The sergeant, correct. So there's one black sergeant? Correct. In the Elster County Jail? And that's all there has ever been. From the beginning of time? From the beginning. I believe there's one guy who was there like six weeks, 30 years ago or something, but Mr. Redding, I'm sure, will point that out. But other than that, nothing, zero, nada. I want to point out before my time runs out, the trial court did something I believe is remarkable, and respectfully, I take great issue with it on behalf of my clients. At page 42, footnote 40 of the trial court's decision, he engages in explicit fact-finding. And what he does is he says the use of the word colored in the workplace is not racist. It's not racism. This is Judge Sutterby saying this in the Supreme Court decision, page 42, note 40. Footnote 40, he says, without more, just because he said the word, he identified an African-American inmate as that colored girl, he says, without more, that's not racist. Well, first of all, we have more. We have 30 years of blatant racism within the facility. And second of all, what does he cite for this proposition? He cites his own case he decided a couple years earlier where he said the use of the word woman of color is not racist. So I take great issue with that. Okay. So let me tell about Norman James, if I may, just to round this out in my last minute before Mr. Redding goes. The Judge Sutterby also engages in fact-finding regarding Officer James. Officer James is a very esteemed, accomplished member of the correction officers group over there. And Norman James was in a deputy role on the CERT team, on a prestigious team. But he was routinely excluded from meetings, from knowing what was going on. If there were drug sweeps, they wouldn't tell him. They would have two, three, four meetings a day where the boss, Becker, would meet with just his favorite white officers and not tell Norman James. And Judge Sutterby at page 6, footnote 7, determines, well, I don't think that that's a fact dispute, because Mr. Becker said to Norman James, you can come up to my office and see me if you ever want to find out what's going on. But the fact of the matter is he never found out what was going on because there were these secret meetings that he wasn't invited to, and only the white officers were invited to. So I take issue with that. I'll say one more thing before, and I'll save the rest for rebuttal. Judge Sutterby gets the standard of review wrong. At page 44 of the decision, and I do believe this is very, very material, Judge Sutterby cites the standard of review for a hostile work environment as requiring severe and pervasive. That's not the standard, as the Court is well aware. The standard is severe or pervasive. So the judge got it wrong. And other than his belief that calling somebody that colored girl is not racism, this may very well be the reason why Judge Sutterby came to the wrong decision here respectfully. Thank you. Thank you very much. You're reserved three minutes for rebuttal. Yes, ma'am. Thank you. We'll hear from the Ulster County leaders. Morning, counsel. Good morning, Your Honors. May I please the Court? Please go ahead. Earl Redding. Romer Wallins. Golden Minow. The first point I'd like to make is just on the last statement that was made. Judge Sutterby at page 44, he does articulate in quoting the Coterell decision, say, severe or pervasive. And so he used the correct standard of review when determining hostile work environment. But he also said severe and pervasive in other places. Did he not? He did say it at the bottom of the page, Your Honor. We do. But if you look through the decision, the decision is clear that what we have here and what you heard is a lot of facts by the plaintiffs trying to tie in this overall theme, which I'll get to, Your Honors, continuing violation question in a second, is what is the tie-in here throughout? And the judge had to go through the statement of material facts that were submitted by us as the movements and then what was responded to. Just as you heard here, there are a lot of facts that the judge seen in the decision or in the brief by the plaintiffs is clearly not within the record. There are things that are not within the time allowed. If they're in the brief, they're in the record. Well, they're so plaintiff makes a claim, as he does here today, that a statement was made to Officer Lancaster. It was made at her. Well, the statement wasn't made at her. If you look in the record of what she says in terms of the colored girl with the blonde hair, the Sergeant Polacco comes into where she is and asks, where is the colored girl with the blonde hair? And Officer Lancaster doesn't report it. It wasn't made towards her. But other people heard it as well, correct? No. No one heard it other than Officer Lancaster. That was it. So how do we know about it? We know about it through Officer Lancaster's own deposition. That's where I say that if you look through what's the record. That is part of the record, Your Honor, correct. Then why did you say it's not part of the record? I didn't say that. I didn't think I said that, Your Honor. And if I did, I apologize. It is part of the record. What I'm saying is that what counsel has said here today, he's misquoting parts of the record to try and get at a material fact to get to trial. That's what he's trying to do. And what I am imploring upon you is that Judge Sotheby got it correct. He had to go through what plaintiff was saying in the brief that's not supported by the record and to show. Did Judge Sotheby make findings of fact as alluded to by opposing counsel? No. Judge Sotheby. He said colored is not discriminatory? Judge Sotheby said at page 42 that it's not politically correct. It does not appear without more to be evidence of racial animus. He's not making the findings of fact. He's making a determination based upon the law. Finding of fact to me. He says it's not, it doesn't imply racial animus. Isn't that a fact that would go to the jury if there was a jury here? Not without more, Your Honor. If there is a jury here, again, we're looking at the hostile work environment standard. You have to look at severe or pervasive. You have to look at also, you know, was it something, and the record is clear that Ms. Lancaster at the time that it was made, she didn't think it was something that rose to a level that she needed to report until the next day, in which she didn't even report it. Somebody else reported it when she told them. Another African-American. How many offensive or racist comments does it take to become pervasive? The court doesn't have a bright line rule as to what, you have to look at the totality of the circumstances. You have to look at the whole work environment. And here, if we look at the work environment of those claims which fall within the statute of limitations, we're looking at only a handful of claims by Ms. Lancaster. Those claims being the claim that there was a joke told in her presence, not a joke told to her, that there was. It doesn't have to be told to her, right? She heard it. That's correct, Your Honor. But you have to do, you do have to, you're correct on the law. But you do have to look at the whole environment here. And whether or not it rises to. The whole environment is what this case is about. What was it like to be a black officer in the Elster County Jail? That's correct. And what you also have to look at when you're looking at this case is, did it alter her terms and conditions? And absolutely not. There is no evidence whatsoever that any of these statements altered Officer Lancaster's terms and conditions of employment. He was working in the pods all the time. That's, the pod system is a system by which. Yeah, I know enough about the prisons. But she asked not to be there. And she never could get out of the pods. But she asked, if you look at the record, though, she asked not to be there before any of the, well, after the Buckwheat statement. But before any of these other statements that fall within the statute of limitations. She asked to be there. She was placed there. And after two days, as you look through the record, you can see, it says that she had, it wasn't something that was for her. And after that time, she never asked. If you look at the record, she, after that time that she was there, she never asked to be placed back in intake. She never asked for that. But she asked not to be in the pods, didn't she? No, she never asked not to be in the pods. Okay. Well, I'll ask opposing counsel. On the statute of limitations issue, I asked your friend about the continuing violation doctrine and whether there was a continuing, what the continuing, the alleged continuing policy of practice was. Could you speak to that and whether plaintiffs have satisfied that here? Yes, Your Honor. I don't believe that he satisfied it. If you look, none of the named defendants were decision makers at the time that any of these alleged acts happened that he's talking about in terms of Palaco. So when Palaco said, what is an offensive term, he was actually brought to discipline when he said effing, Your Honor. And then he got a promotion almost immediately. Not by the defendants that are, that are, that are the named defendants. Not our, not the sheriff, Van Blarkham. He was not the sheriff at the time, nor. What are the promotion? A different sheriff. And it was not. But he got a promotion. You don't deny that, right? No, Your Honor. I don't deny that. So maybe this is like a municipal policy that we're dealing with instead of individual wrongdoers. Well, this is also the, if you look at that, if you take that, what the, what the word, it went to discipline him. It went to a full-blown hearing. After that hearing, he was found not guilty as a result of that. He was on a civil service test. We all know what civil service tests are. He scored well on the test. He was promoted through it. But by none of the defendants that are here. None of the defendants as in Sheriff Van Blarkham. None of, Russo or Becker. And once they had, once there was a finding made that his statement in the presence of Officer Lancaster of the colored girl with the blonde hair, he was correctively actioned for that statement as well. If you, through the record, you can obviously see that it was investigated. I know that the plaintiff's a question with the first investigation. And he was investigated also by personnel when the personnel hired a lawyer to investigate that matter. There is no custom here in which the policy of the jail is to discriminate against the black officers. I will also point out that they've abandoned, if you look at this, they have abandoned that portion. We're only looking at the hostile work environment claims. They would like to bootstrap these claims in which they were unreachable under civil service. It would be great if it could be, if officers could be reachable. The officer that Mr. Charney referenced, he was reachable, scored a 95 and was promoted. He had previously been, he was actually a, he's a corporal. He had previously been a corporal. He lost, voluntarily was demoted based upon a misconduct. And then when he became reachable again, after a period of time, this sheriff that's the defendant here, he promoted him based upon that because of what I would say was that he had shown that he could be a good officer and that the misconduct was passed him. If there aren't any other questions. I believe I'm almost out of time. All right. Thank you. We'll hear from Mr. Charney. He has three minutes for rebuttal. Thank you, Your Honor. The standard is whether the context that these black officers, the plaintiffs were living under in their employment, altered the conditions of employment for the worse. That's the standard. It seems evident that that certainly is sufficient. There's sufficient evidence for a jury to conclude that. And then you look at the totality of the circumstances, which is what we're doing in this discussion. But I take great issue with Mr. Redding's representation to the Court that the black officers, the plaintiffs, did not challenge or complain about the colored girl comment. That's totally not true. They went to the personnel director, Sherry Cross. First, Pam Lancaster goes to Corporal McGurr, her ranking officer, and she complains. Then she goes to Sherry Cross, who's the HR director, the personnel director, and she complains. And you've got to read this part. It's unbelievable what Sherry Cross does. She forces Pam Lancaster to sit in a room with Palacco while Palacco explains to her why the use of the word colored girl is not racist and I'm not a racist. And by the way, a year after we filed this lawsuit, Sergeant Palacco posts a blatantly racist post on Facebook that's in the record where he starts talking about black people like being like dogs on welfare. It's just remarkable. But anyway, the Sherry Cross investigation that resulted because Pam Lancaster complained concludes that there was no racism, everything's fine, nothing to see here, move on. We then filed the lawsuit and the county does presumably what they understand they had to do. They hired an independent attorney. This is Mary Roach. Mary Roach investigates and Mary Roach refuses to investigate 30 years of racism in the jail. She won't do it, probably because the client didn't want her to. She just limits her investigation to the colored girl comment. And she concludes, this is their independent investigator attorney, concludes we are dangerously close to a race-based hostile work environment, especially given the context in this jail. That's their own private investigator that they hired concludes we are dangerously close to a hostile work environment in this jail. So it was complained about. It was investigated by Sherry Cross in the most absurd way, which in and of itself is more hostile work environment activity. And then the neutral comes in and concludes we're dangerously close. I want to draw the Court's attention, if I may, to a recent case in April coming out of this Court, which is right on point. It's Davis v. Garrett. I apologize. I don't have the site, the F-3rd site. It's the case of 17-3371, where summary judgment was reversed. And speaking to Judge Park's questions, it speaks to the discrete acts and looping back into catchment, back in the discrete, the timeliness on the statute of limitations, Davis v. Garrett. Oh, Davis-Garrett v. Urban Outfitters, that's the case. Davis-Garrett v. Urban Outfitters. And the county's on the hook, because under well-established law in this circuit, when you find a pattern of misconduct, when you come to know of it, which they did when Sherry Cross — by the way, Sherry Cross knew about the jigaboo comment. She knew about all the use of the N-word. She knew about the buckwheat comment. She knew about the black man jogging. She knew about the unfair assignments. She knew about the disparate discipline. We have 15 pages in our brief of proof that white officers can shoot somebody on Fifth Avenue and get away with it, while the black officers get removed from the CERT team if they do the tiniest little thing, the disparate discipline. She knew about the colored girl comment. And Sherry Cross not only did nothing, she issued a decision that said, nothing to see here, there's no racism in our department. And it's only Mary Roach who comes in and says, we are dangerously close. This deserves to go to a fact finder. Respectfully, Judge Sotheby got it wrong. He's denied my clients, two of whom are in the room with us today, he's denied them the opportunity to have a fact finder decide these questions of fact. Thank you very much. Thank you. Thank you both. Another interesting case.